IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA THRASHER-LYON, | ) | |
| | ) | |
| on behalf of herself and a class | ) | |
| of others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-cv-04473 |
| v. | ) | |
| | ) | |
| ILLINOIS FARMERS INSURANCE | ) | |
| COMPANY, and CREDIT CONTROL | ) | |
| SERVICES, INC. d/b/a CREDIT COLLECTION | ) | |
| SERVICES, CCS COMMERCIAL LLC  d/b/a/ | ) | |
| CREDIT COLLECTION SERVICES | ) | |
| COMMERCIAL, and CCS FINANCIAL | ) | Judge Castillo |
| SERVICES, INC., | ) | |
| | ) | Jury Trial  Demanded |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

Arthur Loevy
Michael Kanovitz
Jon Loevy
Anand Swaminathan
LOEVY & LOEVY
312 N. May St., Suite 100
Chicago, IL 60607

(312) 243-5900
(312) 243-5902 fax

## **TABLE OF CONTENTS**

Table of Authorities ................................................................................................ ii

Introduction.......................................................................................................... 1

Facts ..................................................................................................................... 5

ARGUMENT ......................................................................................................... 5

I.      **The TCPA and Illinois Automated Telephone Dialers Act Claims**.................................................... 5

      A.    *Plaintiff did not consent to CCS's calls and messages*........................................................ 5

      B.    *CCS's remaining arguments against the Illinois Automatic Telephone Dialers Act claim also fail* ............................. 11

II.     **Illinois Consumer Fraud and Deceptive Business Practices Act Claims** ................................. 12

      A.    *Defendants used deceptive practices* ................................. 13

      B.    *The CFA regulates Defendants' conduct*........................................... 15

      C.    *Plaintiff has standing to bring a private claim under the Act* ........................................................ 17

CONCLUSION.................................................................................................... 20

## TABLE OF AUTHORITIES

Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937 (2009).................................................................19

Avery v. State Farm Mutual Auto. Ins. Co., 216 Ill.2d 100 (2005).............................................12

CE Design Ltd. v. King Architectural Metals, Inc., 637 F. 3d 721 .............................................9
(7th Cir. 2011)

Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,
190 Ill. App.3d 524 N.E.2d 33 (2nd Dist. 1989) ........................................................................18

Duncan v. Walker, 533 U.S. 167 (2001)......................................................................................18

Edeh v. Midland Credit Management, Inc., 748 F. Supp. 2d 1030
(D. Minn. 2010) ..............................................................................................................................8

Frausto v. IC System, Inc.,10-cv- 1363 WL 3704249
(N.D. Ill. August 22, 2011)............................................................................................................7

Glisson v. City of Marion, 188 Ill. 2d 211 N.E.2d 1034 (1999)..................................................19

Global Total Office Ltd. Partnership v.
Global Allies, LLC, 10 C 1896 WL 3205487, *2 (N.D. Ill. 2011).............................................19

Greene v. DirectTV, 10-cv-117, 2010 WL 4628734
(N.D. Ill Nov. 8, 2010)....................................................................................................................9

Greer v. Illinois Housing Development Authority,
122 Ill.2d 462 N.E.2d 561 (1988) ......................................................................................... 18-19

Greisz v. Household Bank, 8 F. Supp. 2d 1031 (N.D.Ill. Mar. 25, 1998) ...................................20

Hill v. Sisters of St. Francis Health Srvs., Inc., 06 C 1488,
2006 WL 3783415, at *5 (N.D. Ill. Dec. 20, 2006)....................................................................20

Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical
Contractors, Inc., 275 Ill. App. 3d 452 N.E.2d 1109 (2nd Dist. 1995)......................................18

Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd., 946 F. Supp. 1358
(N.D. Ill. 1996)..............................................................................................................................18

Maddox v. Love, --- F.3d ----, 2011 WL 3690049, *7 (7th Cir. Aug. 24, 2011) ........................10

Melena v. Anheuser-Busch, Inc., 219 Ill.2d 135 N.E.2d 99 (2006) ...........................................10

Panag v. Farmers Ins. Co. of Washington, 166 Wash. 2d 27,
204 P. 3d 885 (Wash. 2009)......................................................................................14, 15, 16, 17

People *ex rel.* Daley v. Datacom Systems Corp.,
146 Ill. 2d 1 N.E.2d 51 (1991)..................................................................................13, 16, 17, 19

People v. Ceja, 204 Ill. 2d 332 N.E.2d 1228 (2003)....................................................................10

Petri v. Gatlin, 997 F. Supp. 956 (N.D. Ill. 1997)........................................................................18

Roell v. Withrow, 538 U.S. 580 (2003).........................................................................................8

Schultz v. Aviall, Inc. Long Term Disability Plan,
09-cv-2387, 2011 WL 3583806, *3 (N.D. Il. Aug. 2, 2011) ......................................................14

United States v. Useni, 516 F.3d 634 (7th Cir. 2008)...................................................................14

Additional Statutes and Acts

23 F.C.C.R. 559 (F.C.C. 2008) .....................................................................................................6

47 U.S.C. § 227..............................................................................................................................6

815 ILCS 305/1 ..............................................................................................................................1

815 ILCS 305/30.........................................................................................................................9, 11

815 ILCS 505/1.........................................................................................................................1, 17

815 ILCS 505/10a..................................................................................................................... 12, 17

815 ILCS 505/11a........................................................................................................................12

815 ILCS 505/2...................................................................................................................... 12, 17

Plaintiff, Melissa Thrasher-Lyon respectfully submits this response to the Motions to Dismiss filed by Defendants CCS Commercial LLC ("CCS") and Illinois Farmers Insurance Company ("Farmers"). Both motions should be denied entirely for the following reasons.

Introduction

The statues under which Plaintiff brings her case clearly prevent overreaching in the debt collection business. The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and Illinois Automatic Telephone Dialers Act, 815 ILCS 305/1 *et seq.*, prohibit debt collectors from using cell phones as an instrument of harassment. And the Illinois Consumer Fraud Act and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* prohibits misleading or unfair tactics in any communication, electronic or written, by purported creditors and debt collectors alike.

Both sets of laws are implicated here. Simply, Defendants attempted to collect a sum that they mischaracterized as a debt that was "owed," when, in fact, it was nothing more than a demand for disputed and unliquidated damages stemming from a traffic incident for which Defendants unilaterally assigned Plaintiff with 100% of the fault. This mischaracterization of the disputed demand as a liquidated amount due was no mere mistake. Defendants vastly inflated the amount of their demand: for a repair which the police assessed at less than $500, Defendants claimed over $3,000. And, they attempted to bolster the credibility of this sum by falsely stating that the insurance company had paid the entire amount, when, in fact, the check it cut was for thousands of dollars less.

Worse, Defendant CCS went about trying to extract this money from the Plaintiff in relentless and illegal ways. It skimmed her cell phone number from the police report – information that she was required to give to the police under the law – and fed it into a computer that called her repeatedly, sometimes multiple times per day. This violates federal law. Cell

1

phones are different that landline phones: they follow people around all day long, including at their work, and often require additional payment for more frequent use. It is illegal to mount an automated campaign using the number unless the owner consents. Defendant CCS's argument that Plaintiff consented to be harassed in this manner because she gave a police officer her cell phone number is baseless, and no case has come even close to gutting the intent of the federal law (which requires "prior *express* consent") as CCS proposes here.

Because Defendants engaged in the exact type of conduct that the Congress and Illinois' General Assembly intended to outlaw, Plaintiff's Complaint is well-pleaded. It hits on every element of the statutory violations, it is far from implausible, and it provides ample detail to allow Defendants to formulate a response. Defendants' motions should be denied.

<u>Facts</u>

Plaintiff, Melissa Thrasher-Lyon ("Thrasher") is a 22-year-old Barista and bike commuter living in Chicago. Comp. ¶¶ 3, 6. On April 8, 2011, she was involved in a collision with a motorist. <u>Id.</u> Fortunately, the motorist was not injured, and the damages to his vehicle were minor; Plaintiff, who was on her bicycle, was injured only slightly. <u>Id.</u> ¶ 6.

The police arrived and took a police report (which Defendant CCS has tendered to the Court). <u>See</u> Ex. 3 to CCS's Memorandum in Support of its Motion to Dismiss ("CCS Mem."). The police report noted that the damage to the vehicle was only to the right rear panel and amounted to "$500 or less." <u>Id.</u> (Box 37, Box 39). The report contains Ms. Thrasher's identifying information, including, her sex, date of birth, state ID number, address and telephone number. <u>Id.</u> (Box 39).

2

Two weeks later, Ms. Thrasher started receiving letters from Farmers. Comp. ¶ 8. According to the letters, the damages to the vehicle were not $500 or less, but rather $3,240.19. Id.

Farmers sent three letters in rapid succession, characterizing $3,240.19 as the amount Ms. Thrasher "owed." Id. The first letter, dated April 21, 2011 stated, ambiguously, that "[t]he investigation of the facts indicates you are responsible for the damages in the amount of $3,240.19." Id. ¶ 8a; CCS Mem., Ex. 1, at 2. It instructed her to send $3,240.19 and stated that she "must respond within seven(7) days to avoid further action being taken against" her. Id.

The second letter, on May 2, 2011 made similar representations that Ms. Thrasher owed Farmers $3,240.19 and that the company intended to take further action if she did not pay. Comp. ¶ 8b; CCS Mem., Ex. 1, at 3.

The third letter, dated May 11, 2011, again reiterated that there had been an unspecified "investigation of the facts" which determined that she is "responsible for the damages in the amount of $3,240.19." Comp. ¶ 8c; May 11, 2011 Letter from Farmers to Thrasher (and attachments), attached as Exhibit ("Ex.") 1 hereto. This third letter included a document entitled "Estimate of Record." Id. at 4.

Carefully studied, the document shows that Farmers' claim that Ms. Thrasher owed $3,240.19 was in fact inflated. The estimate lists 63 separate parts that supposedly needed to be replaced as a result of the bicycle accident, and stated, incredibly, that 59 hours of labor would be required to fix the car. Id. at 4-7. Further, on close examination, the estimate also includes damages that cannot possibly be due to the collision. Some of the parts actually involve the front passenger-side door, even though the police report confirms that the bicycle collided only with the rear quarter panel of the vehicle. Id.; CCS Mem., Ex. 3 (Box 39).

Unlike the other letters, this third letter with the inflated estimate further threatened Ms. Thrasher that: "The amount you owe may increase due to additional medical or property damage payments." Id. at 1. It told her to enclose $3,240.19 "to settle this claim," and again threatened to take further action. Id.

Next, Ms. Thrasher began receiving letters from Defendant CCS. Comp. ¶ 10. The letters were styled as a "Warning Notice" informing her that it was acting on behalf of "client" "Farmers Insurance Exchange," to collect $3,240.19. Id.; May 16, 2011 Warning Notice, attached as Ex. 2 hereto.[1] The letter stated that "[t]he above referenced amount **was paid by our client**" and that "[a]ny further damages **paid by our client** . . . will be added to this figure." Id. (emphasis added). It also included a box stating, "PAY IMMEDIATELY, $3,240.19." Id.

In fact, the client, Farmers, had not paid anything close to this sum. It paid only $740.19, which was the sum above the insured's deductible. Comp. ¶ 11. There was, in fact, no evidence provided that the inflated $3,240.19 sum was ever actually paid by anyone.

The letter also directed Ms. Thrasher to use a website, www.warningnotice.com, where she could pay using a credit card, make arrangements to pay over time, print periodic payment vouchers, and access other services. Id. The notice also stated that she could use a service to get a free copy of her "consumer credit report" from three "consumer reporting agencies" if she went to the website. Id. She received a similar letter from CCS dated June 6, 2011. Comp. ¶ 10; June 6, 2011 Warning Notice, attached as Ex. 3 hereto.

On June 27, 2011, she received another letter from CCS. Comp. ¶ 13; June 27, 2011 Settlement Notice, attached as Ex. 4 hereto. This letter was labeled "Settlement Notice" instead of "Warning Notice," id., and offered Ms. Thrasher settlement services. Instead of the

---

[1] CCS attached "form" notices to its brief, claiming that thee are the documents referenced in the Complaint. They are not. Plaintiff has attached the actual letters referenced in the Complaint.

"www.warningnnotice.com" website, this letter listed the "www.settlementnotice.com" website.

CCS stated in the notice that Ms. Thrasher could "pay a reduced amount at this time" and that

the "office will update the status of your account as settled-in-full." Id. It also stated: "For

personal assistance, you are encouraged to contact a service representative to discuss suitable

payment arrangements. Otherwise please remit the full amount." Id. The notice also informed

Ms. Thrasher that she could get a free "consumer" credit report by going to the

www.settlementnotice.com website. Id.

At the same time that CCS was sending the "warning notice" and "settlement notice"

letters to Ms. Thrasher, it was also phoning her incessantly and harassing her. Comp. ¶¶ 15-17.

It obtained her cell phone number from the police report, CCC Mem. Ex. 3, and programmed it

into its automatic dialing equipment. Id. ¶ 16. CCS places such calls on a proprietary platform

that is capable of "generat[ing] millions of contacts daily." Id. ¶ 22.a.

When she could get to the phone in time to answer, there would be no person on the other

end, just dead air. Id. ¶ 16. When she did not answer the calls, there would be a prerecorded

message left on her voicemail. Id. Thrasher did not consent to CCS calling her at this number.

Id. ¶ 17.

CCS used the automated dialing equipment to harass Ms. Thrasher despite its knowledge

that such uses are prohibited by federal law. Id. ¶ 18.

ARGUMENT

## I. The TCPA and Illinois Automated Telephone Dialers Act Claims

### A.    *Plaintiff did not consent to CCS's calls and messages*

CCS's sole argument for dismissing Plaintiff's TCPA claim is that Plaintiff consented to

it calling her when she gave her phone number to a police officer at the scene of the accident,

5

consent being an exception under the TCPA. The term Congress used when describing this exception is "prior *express* consent." See 47 U.S.C. § 227 (b)(1)(A) (prohibiting the use of automated dialing equipment to call cell phones absent "the prior express consent of the called party").

Those three words, "prior express consent," are completely ignored in CCS' brief and they completely defeat its argument for the exception. It never got Plaintiff's express consent. It skimmed her phone number from a police report. Her act in giving her phone number to a police officer would at best amount to implied consent (and even that would be indulging highly speculative inferences in CCS's favor).

Several paths all lead to this same conclusion. Putting aside, for the moment, that the plain language meaning of "express consent" precludes the type of implied consent for which CCS is arguing, the fact is that the Federal Communications Commission ("FCC") has chimed in with an interpretation of the language that precludes CCS's argument; and that interpretation is entitled to deference. The FCC explains that Congress used the "prior express consent" language to cover situations where a party "provided the telephone number *to the caller* for use in *normal business communications*." See In re: Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 23 F.C.C.R. 559, 564 ¶ 9 (F.C.C. 2008) (emphasis added), copy attached as Ex. 5 hereto. The police report as consent scenario that CCS relies on here is in no way analogous.

CCS purports to rely on the FCC's interpretation, but that is just rhetoric and its claim of support in the ruling is hollow. See CCS Mem. at 4 (citing Frausto v. IC System, Inc.,10-cv-1363, 2011 WL 3704249 (N.D. Ill. August 22, 2011) (in turn citing the FCC ruling)). The FCC ruling arose in the context of a debtor voluntarily providing his cell phone number to the creditor

6

in his credit application. The FCC found that providing the cell phone number directly to the creditor constituted consent within the meaning of the TCPA.

Importantly, the FCC was not announcing some general and broad proposition that a cell phone user consents simply by disclosing his cell phone number (as CCS reads it). Rather, it took pains to emphasize how its interpretation of "prior express consent" was narrowly limited to the credit application context, stating:

> We emphasize that prior express consent is deemed to be granted *only if* the wireless number was provided *by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed.* To ensure that creditors and debt collectors call only those consumers who have consented to receive autodialed and prerecorded message calls, we conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent. The creditors are in the best position to have records kept in the usual course of business showing such consent, *such as purchase agreements, sales slips, and credit applications.*

Id. at 564 ¶ 10 (emphasis added).

A phone number provided by a citizen to a police officer, and which a purported debt collector later skims out of the report, has none of the hallmarks of the "prior express consent" that the FCC was discussing. Plaintiff did not give her phone number to CCS, and the police report was not a contract, or a document reflecting an intent to enter into a contract such as a purchase agreement, credit application or like document, giving express authorization. The police report did not even reflect a relationship between Plaintiff and the caller. Thus, the FCC interpretation not only fails to support CCS, it defeats CCS's position.

Turning to the language of the statute itself, CCS's argument fares no better. At base the Court is required to give effect to each of the words Congress chose when it described the required consent, including the word "express." Duncan v. Walker, 533 U.S. 167, 174 (2001) ("[W]ere we to adopt respondent's construction of the statute, we would render the word 'State'

7

insignificant, if not wholly superfluous. It is our duty to give effect, if possible, to every clause and word of a statute.") (citations and internal quotation omitted). CCS's argument is untenable because it ignores the word "express."

Plaintiff did not tell CCS to call her on her cell phone number, she did not tell the police officer to tell CCS to call her there, and neither the police officer nor the police report told Plaintiff that she was consenting to CCS's calls by providing her cellular phone number to the police (and Plaintiff did not even fill out the report). At best, CCS is making an argument for implied consent, and implied consent is simply not good enough. See Roell v. Withrow, 538 U.S. 580, 588 (2003) (where magistrate referral statute used unqualified term "consent" litigations' consent could be express or implied, but under statute for referral to a part time magistrate, which uses the term "written consent," consent must be express); Edeh v. Midland Credit Management, Inc., 748 F. Supp. 2d 1030, 1038 (D. Minn. 2010) ("'Express' means 'explicit,' not, as Midland seems to think, 'implicit.' Midland was not permitted to make an automated call to Edeh's cellular phone unless Edeh had previously said to Midland (or at least to Midland's predecessor in interest) something like this: "I give you permission to use an automatic telephone dialing system to call my cellular phone."). Thus, under the words Congress chose, CCS cannot tenably rely on any argument for consent derived implicitly from the fact that Plaintiff provided her phone number to the police officer.

The cases that CCS cites only reinforce Plaintiff's point. Frausto involved a collection of a debt owed on a PayPal account where the contract the plaintiff signed expressly stated, "By providing PayPal a telephone number (including a wireless/cellular telephone), you consent to receiving autodialed and prerecorded message calls from PayPal at that number." Id. at *1. Here, the police report does not contain a similar authorization, and CCS identifies no other

8

document containing anything close. CE Design Ltd. v. King Architectural Metals, Inc., 637 F. 3d 721 (7th Cir. 2011), was a class action where the named plaintiff, a company, received a fax from a fellow construction firm based on the plaintiff having put its number on its website with the statement "contact us," and having added its fax number to an industry directory (the "Blue Book") where the terms of use to which the plaintiff agreed were that "'by supplying The Blue Book with your fax and e-mail address, you agree to have The Blue Book and users of The Blue Book services communicate with you via fax or e-mail.'" Id. at 725.[2]

Similarly, in Greene v. DirectTV, 10-cv-117, 2010 WL 4628734 (N.D. Ill Nov. 8, 2010) the plaintiff signed up for a credit fraud alert service and expressly told the service that her cellular telephone number was the number where she wanted to receive fraud alert checks. Id. She sued after later receiving an automated fraud alert message. Id. The court held that she had consented to be called at the very number because she had expressly told the alert service that she wanted to be called there for fraud alerts. Id. Again, the context of actual express consent in these cases is wholly different from the facts at bar.[3]

Turning to the Illinois Automated Telephone Dialers Act ("Illinois Act"), 815 ILCS 305/30(b), CCS makes a one sentence argument that Plaintiff consented to it leaving her recorded messages. It is true that the act has a "consent" exception to the prohibition on using

---

[2] Moreover, the Seventh Circuit did not even rule that the third party Blue Book contract constituted express consent. Id. ("Whether the website plus the Blue Book form added up to CE's consenting for King to fax advertisements to it presents a question that neither the statute nor the case law, nor the interpretation of the statute by the Federal Communications Commission, answers."). Rather it simply held that the trial court should consider whether to certify subclasses of recipients who did and did not list themselves in the Blue Book so that the defendant could present its argument that the Blue Book contract was express prior consent. Id. at 728.

[3] The plaintiff in Greene also seems to have accepted, unwisely, the defendant's argument that her authorization to the fraud alert service fell within the FCC's ruling about credit applications, and she asked the court to disregard the agency's interpretation, which the court felt it could not do. Id. at *3. By contrast, Plaintiff asserts that the facts here fall well outside of the creditor/credit application context to which the FCC's interpretation was expressly limited.

recorded messages (but the Illinois Act contains no consent limitation with regard to the use of autodialers), and there appears to be no case law on whether the Illinois Act requires express consent or whether implied consent will do. But even using an implied consent interpretation, CCS's motion fails.

To succeed on a motion to dismiss, CCS must demonstrate that Plaintiff's lack of consent allegation is rendered "implausible" by the police report. Maddox v. Love, --- F.3d ----, 2011 WL 3690049, *7-8 (7th Cir. Aug. 24, 2011). CCS misses that hurdle by a mile.

Under Illinois law, consent is implied based upon conduct showing that a person has actual knowledge of the act to which they are consenting. This is particularly true where the person is alleged to be foregoing a statutory right. See Melena v. Anheuser-Busch, Inc., 219 Ill.2d 135, 142, 847 N.E.2d 99 (2006) (generally a statutory right can be relinquished only through a knowing and voluntary waiver); People v. Ceja, 204 Ill. 2d 332, 349-50, 789 N.E.2d 1228 (2003) ("Consent exists where a person's behavior manifests acquiescence or a comparable voluntary diminution of his or her otherwise protected rights. Implied consent is consent in fact, which is inferred from the surrounding circumstances indicating that the party knowingly agreed to the [challenged conduct]").

Viewed in light of the applicable case law, CCS's argument is frivolous. There is nothing in the factual context of Plaintiff giving her telephone number to a police officer to indicate that she was knowingly relinquishing her statutory right not to get recorded messages from CCS. Even if CCS could raise an inference that the context did provide her notice of its conduct (which it has not done and cannot do), it could not bear sufficient weight to render "implausible" Plaintiff's allegation that she did not consent. Accordingly, its motion to dismiss on this score must be denied.

10

B.     *CCS's remaining arguments against the Illinois Automatic Telephone Dialers Act claim also fail*

CCS's remaining arguments are easily refuted. First, CCS argues that Plaintiff has not alleged a violation of the Act's restrictions on the methods of using autodialers. CCS Mem. at 6. That is true, but Plaintiff does not purport to allege such a violation. Instead she brings her claim only under the recorded messages provision. 815 ILCS 305/30(b).

As to the recorded messages provision, CCS argues that the statute requires actual damages and that Plaintiff has not pleaded any. CCS Mem. at 7. CCS is correct as to the first part and wrong as to the second. The Act does require that a Plaintiff prove actual damages to prevail, but the case is at the pleadings stage and Plaintiff has pleaded that she was damaged. Comp. ¶ 50. Defendant points to nothing that makes this allegation implausible. See also discussion infra pp. 19-20.

Nor is it implausible to conclude that the prerecorded messages involved a solicitation of the sale of services. CCS's Supplemental Memorandum, at 1-2. Plaintiff alleges that CCS left the messages in conjunction with its letter campaign to Plaintiff in which it was trying to get Plaintiff to part with her money. Comp. ¶ 15. It asked Plaintiff to call its service representatives, offered to give her payment plans, free credit reports, and eventually offered to let her pay a "reduced amount" if she acted quickly. Supra pp. 4-5. It also told her that she could use its website to service her "account" and print payment vouchers for making periodic payments.

Drawing all reasonable inferences in Plaintiff's favor, as the Court must on a motion to dismiss, CCS's campaign creates the impression that it is offering services in connection with reducing and managing payment of a debt. Moreover, the offer of a payment plan on a debt that is due is an offer to extend credit, which is also a service. Thus, the allegations are sufficient at

11

the motion to dismiss stage and Plaintiff should be permitted discovery to build a more fulsome factual record about CCS's actual practices.

## II. Illinois Consumer Fraud and Deceptive Business Practices Act Claims

Plaintiff's Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act") claims arise under 805 ILCS 505/2, which prohibits, *inter alia*, "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce." 815 ILCS 505/2. Section 10a of the Act provides a cause of action to persons who suffer actual damages as a result of a violation of Section 2, stating: "Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." 815 ILCS 505/10a(a).

This fact is well established in Illinois law. Case law recognizes five elements to a private claim under the statute. "To prove a private cause of action under section 10a(a) of the Act, a plaintiff must establish: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) *the occurrence of the deception in the course of conduct involving trade or commerce*, and (4) actual damage to the plaintiff (5) proximately caused by the deception. Avery v. State Farm Mutual Auto. Ins. Co., 216 Ill.2d 100, 187 (2005) (internal citation omitted; emphasis added).

Defendants each raise the same two challenges: first, that their deception did not involve trade or commerce within the meaning of the Act because Plaintiff is not a consumer; and second, that Plaintiff suffered no actual damages as is required to give a private citizen standing to enforce the Act. Their arguments are all predicated on unduly narrow and twisted readings of the Act, directly contravening the statute's explicit instruction that it "shall be liberally construed to effect the purposes thereof." 815 ILCS 505/11a.

12

In point of fact, nothing in the language of Section 2 nor Section 10 limits the scope to "consumers" as opposed to all "persons." Id. Rather, the touchstone requirement is that the deception occur in the course of "trade" or commerce" under Section 2. Further, as is explained below, the Illinois Supreme Court already rejected Defendants' central argument (in a decision that both fail to cite). In People ex rel. Daley v. Datacom Systems Corp., 146 Ill. 2d 1, 29, 585 N.E.2d 51 (1991), the Court found that the Consumer Fraud Act applied to a collection company that was attempting to collect fines owed by parking violators. As here, the alleged debt in Daley involved no consumer connection at all, but the Court held that there need not be a "consumer" connection. Id. The defendant was engaged in commerce and its bill collecting practices were deceptive. The Illinois Supreme Court's holding that such conduct falls within the scope of the Act is clear and, most important, provides the binding law for this case.

For this and other reasons explained below, Defendants' arguments should be rejected and their motions accordingly denied.

A.    *Defendants used deceptive practices*

Both Defendants make a perfunctory and unexplained claim that their letters were not deceptive and then they quickly turn to their technical legal arguments about why their business model is beyond the reach of the CFA. Offering no actual argument that the alleged conduct is not deceptive or unfair, Defendants certainly fail to develop any grounds to dismiss on this prong. See United States v. Useni, 516 F.3d 634, 658 (7th Cir. 2008) ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." (quotation omitted)); Schultz v. Aviall, Inc. Long Term Disability Plan, 09-cv-2387, 2011 WL 3583806, *3 (N.D. Il. Aug. 2, 2011).

Moreover, as the Facts section of this brief shows, Defendants engaged in a genuine deceitful scheme. They used misleading letters to mislead Plaintiff into believing that "the investigation" had already determined that she was 100% at fault, that the damages were over $3,000 and that this amount was due from her immediately, meaning that there was nothing she could do about it but give in. That was completely untrue. This was not an "account" that she owed with Farmers, it was a settlement demand where the would-be plaintiff was demanding every dollar that it could possibly someday prove it was entitled to by getting a judgment. CCS and Farmers engaged in the exact same conduct in Washington State and the Washington Supreme Court had this to say about it:

> The CPA is a particularly appropriate vehicle for reaching the collection practices at issue. . . . The deceptive use of traditional debt collection methods to induce someone to remand payment of an alleged debt is precisely the kind of "inventive" unfair and deceptive activity the CPA was intended to reach. . . .

> CCS contends, however, that the collection notices were not deceptive because they accurately state the demand was related to a subrogation claim. But as the Court of Appeals recognized, a communication may contain accurate information yet be deceptive. Deception exists "if there is a representation, omission or practice that is likely to mislead" a reasonable consumer. . . . Under the FTCA, a communication may be deceptive by virtue of the "net impression" it conveys, even though it contains truthful information. An ordinary consumer would not understand the meaning of a "subrogation claim" and likely would interpret the collection notices as representing a liquidated debt that the recipient is bound to pay rather than a potential tort claim that is subject to dispute.

Panag v. Farmers Ins. Co. of Washington, 166 Wash. 2d 27, 204 P. 3d 885, 895-96 (Wash. 2009).[4] The letters Defendants sent here suffer from all the same deceptive hallmarks as in Panag and, in some respects, worse.[5]

---

[4] The Court also went on to note that CCS created a misimpression that it was collecting a typical consumer account deceiving recipients to put greater trust in the company's representations of what was "due" because such collections are highly regulated by state and federal law. Id. at 897-98 ("[T]he debtor who receives a letter masquerading as a bona fide collection notice from a regulated collection agency may be lulled into believing he or she is protected by the regulations generally applicable to debt collection.").

14

*B.    The CFA regulates Defendants' conduct*

Plaintiff's claims are predicated on the understanding that Defendants' debt collection conduct constitutes "trade" or "commerce" within the meaning of Section 2 of the Act. That is an understanding that Defendants are trying to convince the Court is incorrect. If Plaintiff is correct, then Defendants have to abide by the Act, which they failed to do.

Buried in a footnote, Farmers acknowledges, as it must, that the Washington Supreme Court has already considered the very same subrogation collections practices as alleged here and found that Farmers (and CCS who was also a defendant in that case) violated Washington's Consumer Fraud Act, which also is limited to "trade" or "commerce." See Farmers's Mem. at 5 n.2; Panag, 204 P. 3d at 890. The Panag court rejected Defendants' argument for a consumer transaction requirement, stating: "Under the plain language of the act, it is not necessary to establish any consumer relationship, direct or implied, between the parties." Id. Farmers offers a conclusory statement that Illinois courts interpret the Illinois' Act "very different[ly]" than in Panag, although it never gives any back up or explanation. CCS never mentions the case at all.

In fact, the Washington statute at issue in Panag and the Washington Supreme Court's reasoning are both on all fours with Illinois law. Id. at 890-92. So the case is highly instructive and should not be ignored, as Farmers urges (and as CCS did). But, even more significantly, Panag is no different than the binding decision of the Illinois Supreme Court in People ex rel. Daley v. Datacom Sys. Corp., 146 Ill. 2d 1, 29, 585 N.E.2d 51 (1991), which certainly supplies the rules of decision for this case.

---

[5] Ignoring the correct standard on a motion to dismiss, Farmers tells the Court that it paid the $3,240.19 that Plaintiff alleges it did not pay. Farmers Mem. at 1. Farmers is mischaracterizing the Complaint and trying to blur the line between a subrogation right and a false statement that Farmers itself paid the full amount. The letter did not say the former, it said the latter. And a false statement that the insurance company actually paid $3,240.19 furthers the misimpression that the sum was not merely an inflated estimate but actually-paid monies. In fact, the $3,240.19 was nothing but an estimate inflated with extra labor and parts and repairs for damages that did not result from the bike collision.

In <u>Daley</u>, the City of Chicago hired Datacom to collect unpaid parking tickets – a debt, which, like the one at issue in this case, is due to an alleged violation of law and not a "consumer" transaction. <u>Id.</u> at 22. Like Defendants here, Datacom argued that it was not liable because parking violators are not "consumers." But the Illinois Supreme Court rejected the argument stating:

> Datacom primarily contends the Consumer Fraud Act is inapplicable because the Act protects only consumers, the alleged parking violators are not consumers, and therefore the alleged parking violators do not have standing under the Act. . . . However, we cannot accept such a restrictive construction of the Consumer Fraud Act.

<u>Id.</u> at 29.

The Court went on to explain that Datacom had sold its services to the city and that its act of sending collection letters therefore satisfied the definition of "trade" or "commerce," stating:

> These actions constituted the sale and distribution of services which directly or indirectly affected the people of Illinois, namely the alleged parking violators, and thus amounted to the conduct of trade or commerce as defined by the Consumer Fraud Act.

<u>Id.</u> at 30.

The Supreme Court's analysis is dispositive as to both CCS and Farmers. CCS plainly is in the same position as Datacom in that it is a debt collector that contracted to provide debt collection services which affect the citizens of Illinois. Farmers is essentially no different. Recall that Farmers paid only $720.19 but was trying to collect $3,240.19. As it contends in its brief, it was collecting a debt, owed in part to its insured. Farmers Mem. at 7. Under the law of subrogation, if Farmers collected the amounts it was trying to get, it had to pay its insured for the portion that the insured paid.[6] 215 ILCS 5/143b.

---

[6] This is based on Farmers's assertions. Plaintiff believes that the "Estimate of Record" was inflated and included damages not caused during the bicycle accident. The dispute is not dispositive. All that is required for present purposes is that Farmers was asserting such a debt.

Panag reinforces Daley's holding. Citing a Federal Trade Commission Act ruling, the Panag Court held that "[t]he deceptive use of traditional debt collection methods to induce someone to remand payment of an alleged debt is precisely the kind of 'inventive' unfair and deceptive activity the [Washington consumer fraud statute] was intended to reach." Panag, 204 P.3d at 895. Cf. Daley, 146 Ill. 2d at 30-31 (in finding that the collection agency's notices to parking violators satisfied the trade or commerce requirement, the Illinois Supreme Court noted that "[f]ederal courts have held that the deceptive acts or practices forbidden by the Federal Trade Commission Act include those used in the collection of debts").

Thus Daley, as it applies to Illinois law in general, and Panag, as it applies to the very same defendants now before the Court, both demonstrate that the Defendants' subrogation collection practices are regulated as trade or commerce by 815 ILCS 505/2. Further, neither Defendant develops any argument that their conduct was not deceptive, which, of course, it was. Accordingly, the Complaint establishes that Defendants violated the Act.

C.     *Plaintiff has standing to bring a private claim under the Act*

Defendants' remaining argument is that Plaintiff does not have standing to seek redress for their violations, supposedly because she must be a consumer and because she has not alleged actual damages. Defendants are wrong on both scores.

According to its plain language, Section 10a allows: "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." 815 ILCS 505/10a(a). Conspicuously absent is any statement that the "person" be a "consumer," both of which are separately-defined terms under the Act. See 815 ILCS 505/1 (c) (defining "person"), (e) (defining consumer).

17

Defendants try to create a requirement that a person be a consumer in order to have standing by engrafting a "consumer nexus test" into Section 10a. Their argument uses an inapposite application of case law involving corporate plaintiffs.

The consumer nexus test is a standard that courts have created to address standing when corporations try to bring claims under the Act. See Petri v. Gatlin, 997 F. Supp. 956, 969 (N.D. Ill. 1997) (in a case brought by an individual person "the consumer nexus test is inapplicable because the dispute at hand does not involve 'two businesses that are not consumers.'" (citing Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd., 946 F. Supp. 1358, 1368 (N.D. Ill. 1996) (emphasizing that the test "applies only to a Consumer Fraud Act action by a business that is not a consumer of the other business's products")).

These courts' use of a "nexus" test arose from the fact that the interests that arise in inter-corporate transactions are not the sort that the Act usually protects. Id. In this milieu, courts use the "consumer nexus test" to ensure that the rights the corporate plaintiff is asserting are rights protected by the Act. Id.; Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc., 190 Ill. App.3d 524, 534, 546 N.E.2d 33 (2nd Dist. 1989) ("The analysis in [prior case law] accurately poses the issue as a question of whether the alleged conduct has characteristics which bring it within the Act."). The cases use the term "consumer protection" as shorthand for whether an interest is protected under the Act. See id.; see also Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc., 275 Ill. App. 3d 452, 458 654 N.E.2d 1109 (2nd Dist. 1995) ("Where a dispute involves two businesses that are not consumers, the proper test is 'whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.'").[7]

---

[7] Defendants raise the test as an issue of standing, but it is far from clear that this is correct. None of the Defendants' cases are from the Illinois Supreme Court, and the Court's decisions on standing suggest that

18

Where, as here, the plaintiff is an individual person asserting conduct that the Illinois Supreme Court has already found to be within the scope of the Act, <u>Daley</u>, 146 Ill. 2d at 30-31, the concerns that lead to application of a nexus test are absent. Ms. Thrasher is clearly protected by the Act, Defendants' debt collection practices are clearly regulated by the Act, and the alleged misconduct was directed at Ms. Thrasher personally. <u>Compare</u> <u>Global Total Office Ltd. Partnership v. Global Allies, LLC</u>, 10 C 1896, 2011 WL 3205487, *2 (N.D. Ill. 2011) ("nexus test" case cited by both Defendants in which a corporate plaintiff alleged that is was damaged when corporate defendant confused third-party consumers about plaintiff's trademark).

Defendants' only remaining point is that a plaintiff must suffer "actual damages" as a result of a violation of the act, which is true. Where they go wrong is in their contention that Plaintiff failed to sufficiently allege damages in accordance with <u>Ashcroft v. Iqbal</u>, 556 U.S. ___, 129 S. Ct. 1937 (2009). But Defendants are asking for too much. Under <u>Iqbal</u>, Plaintiff need only make an allegation of damages that is factual, as opposed to a legal conclusion, and the allegation must not be "implausible" under the circumstances. Plaintiff meets that requirement.

As Defendants acknowledge, Plaintiff did allege that she suffered damages as a result of their deceptive letters. Comp. ¶¶ 55, 61. They posit, though, that the allegation is implausible because Plaintiff does not allege that she acted on the letters. However, acting on the letters is not a requirement for suffering actual damages.

---

it would reject a "consumer nexus test" because it is essentially a "zone of interests" test. <u>See</u> <u>Glisson v. City of Marion</u>, 188 Ill. 2d 211, 222, 720 N.E.2d 1034 (1999) ("We reject the [Appellate Court's] <i>Lynch</i> test. . . . The <i>Lynch</i> test provides that, where the suit alleges injury due to violation of a statute, the doctrine of standing requires that the plaintiff be a member of the class designed to be protected by the statute, or one for whose benefit the statute was enacted, and to whom a duty of compliance is owed. This test is similar to the zone-of-interests test [which we rejected in <i>Greer</i>]"); <u>Greer v. Illinois Housing Development Authority</u>, 122 Ill.2d 462, 524 N.E.2d 561 (1988) (zone-of-interest tests conflates the question of standing with the existence of a cause of action). Even if the Court did adopt a "nexus" test, its cases shows that it would formulate the test in a way that acknowledges Plaintiff's standing. It would be a bizarre result for the Supreme Court to hold in <u>Daley</u> that deceptive debt collection practices violate the Act but then find that a plaintiff who is directly aggrieved by the same conduct lacks standing.

19

For example, case law established that actual damages can include emotional distress from having been lied to about one's indebtedness or its extent, even when the plaintiff refuses to pay a false bill. Hill v. Sisters of St. Francis Health Srvs., Inc., 06 C 1488, 2006 WL 3783415, at *5 (N.D. Ill. Dec. 20, 2006) (CFA case finding emotional distress damages from an inflated bill that the plaintiff refused to pay). See also Greisz v. Household Bank, 8 F. Supp. 2d 1031, 1043-44 (N.D.Ill. Mar. 25, 1998) (CFA case stating that "it is well established in Illinois that actual damages include compensation for mental suffering") (internal citations and quotations omitted).

It is not implausible that Ms. Thrasher, a 22- year old Barista, would suffer distress at being lied to that she owed multiple thousands of dollars that she could not dispute. The letters used a threatening tone, Comp. ¶¶ 8-11,13; falsely stated that Farmers had paid $3,240.19 when in fact it had paid nothing close to that, id. ¶ 11; falsely led Ms. Thrasher to believe that the debt was a *fait accompli*, ¶¶ 9,12, that "the investigation" had determined her to be solely at fault, id. ¶ 9, and that she had lost her opportunity to do anything about it. Id. ¶¶ 9, 12. Moreover, the swing from "less than $500" to the inflated $3,240.19 is a big one for a young person in her position. Hers are not "unadorned" allegations of damage. The only question at this stage is whether Plaintiff "plausibly" alleged that she suffered *any actual damages at all*, and these allegations pass that test.

Accordingly, Plaintiff has satisfied each of the pleading requirements for a CFA claim.

Conclusion

For the foregoing reasons, both Defendants' Motions to Dismiss the Complaint should be denied in their entireties.

RESPECTFULLY SUBMITTED,


/s/ Anand Swaminathan
Attorneys for Plaintiff and the Class

      Arthur Loevy
      Michael Kanovitz
      Jon Loevy
      Anand Swaminathan
      LOEVY & LOEVY
      312 N. May St., Suite 100
      Chicago, IL 60607

      (312) 243-5900
      (312) 243-5902 fax

## CERTIFICATE OF SERVICE

I, Anand Swaminathan, an attorney, certify that on September 12, 2011, I served a copy of Plaintiff's Response to Defendants' Motions to Dismiss on counsel of record via electronic mail.

RESPECTFULLY SUBMITTED,

/s/ Anand Swaminathan

22