IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELISSA THRASHER-LYON, *on behalf of herself and a class of others similarly situated*,<br>        Plaintiff,<br>    v.<br>CCS COMMERCIAL, LLC,<br>        Defendant. | No. 11 C 04473<br>Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

In this putative class action brought pursuant to the Telephone Consumer Protection Act, the named plaintiff, Melissa Thrasher-Lyon, alleges that Credit Collection Services Commercial ("CCS") unlawfully placed robocalls[1] to her cellular telephone in connection with an insurance subrogation claim that Farmers Insurance referred to CCS for collection. As an affirmative defense, CCS pleaded that it had Thrasher-Lyon's prior express consent to receive its calls on her cell phone. *See* 47 U.S.C. § 227(b)(1)(A)(iii). Both parties have moved for partial summary judgment on this affirmative defense.

The parties agree on the basic facts. On April 8, 2011, Thrasher-Lyon crashed into a car while riding her bicycle. At the scene, she gave her cellular telephone number to the car's driver, Charles Ferguson, and to the Chicago police officer who responded the to the scene and wrote up an incident report. Illinois Farmers Insurance Company, Ferguson's insurer, contacted Thrasher-Lyon at that phone number days after the accident and recorded her statement. In response to the

---

[1] The Court uses the shorthand "robocall" to refer to calls restricted pursuant to 47 U.S.C. § 227(b)(1)(A), namely, those employing "any automatic telephone dialing system or an artificial or prerecorded voice."

1

agent's question about the best way to reach her, Thrasher-Lyon stated that the number the agent had just called, which was her cellular phone number, was her only contact number.

Based on its investigation, Farmers paid Ferguson the amount of his loss, minus his deductible, and then notified Thrasher-Lyon of its subrogation claim. Farmers sent Thrasher-Lyon a couple of letters seeking payment of $3,240.19, which it called the "amount owed." After the letters went unanswered, Farmers referred the (unadjudicated) subrogation claim to CCS for collection. Thereafter, CCS placed one or more calls to Thrasher-Lyon's cellular telephone, using technology that, for purposes of the pending motions, the parties agree falls within the TCPA's definition of "automated telephone equipment."

CCS had no direct contact with Thrasher-Lyon before placing the calls. It did not determine whether the number it used was for a land line or a mobile phone, nor did it take steps to discern whether Thrasher-Lyon had consented to receive robocalls. When CCS receives contact information from a subrogation client, CCS assumes[2] that prior express consent was given to the client by virtue of obtaining the information. Farmers did not request or obtain Thrasher-Lyon's express consent to receive robocalls when it confirmed her contact information, nor, in CCS's understanding, would such a practice be typical among its subrogation clients.

Thrasher-Lyon sued CCS and Farmers (which is no longer a defendant), alleging that CCS's robocalls to her cell phone violated the TCPA, which provides:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to make any call (**other than a call . . . made with the prior express consent of the called party**) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . .

---

[2] CCS denies that it "simply assumes" consent, but it admits that, after receiving contact information from a client such as Farmers, it does not take any steps to investigate or verify whether express consent was given. The Court does not discern any material distinction between CCS's admitted practice and "simply assuming" consent.

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). CCS maintains that it had Thrasher-Lyon's prior express consent because she voluntarily disseminated her cellular telephone number to (1) Ferguson; (2) the police; and (3) Farmers; and, furthermore, because she admitted to Farmers that it is her only contact number. Thrasher-Lyon argues that she did not expressly consent to receiving robocalls about Farmer's subrogation claim just by giving out her number in connection with the accident. Both parties now request partial summary judgment on the issue of whether Thrasher-Lyon gave "prior express consent" within the meaning of the statute.

Summary judgment will be granted when the moving party shows that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Davis v. Ockomon*, 668 F.3d 473, 477 (7th Cir. 2012). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Davis*, 668 F.3d at 477. When cross-motions for summary judgment are being resolved together, this same standard applies in favor of the party against whom the motion under consideration is made. *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011).

At issue is a pure question of statutory interpretation. Interpreting a statute begins, and should usually end, with the language of the statute itself. *Emergency Services Billing Corp., Inc. v. Allstate Ins. Co.*, 668 F.3d 459, 465 (7th Cir. 2012) ("When interpreting any statute, we begin with the statutory language itself and assume that the plain meaning, if easily ascertained, adequately expresses the intent of the legislature."); *River Road Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 649 (7th Cir. 2011) ("If we find that the language in a statute is unambiguous, we will not conduct further inquiry into its meaning and enforce the statute in accordance with its plain meaning."); *Precision Industries, Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 543-44 (7th Cir. 2003). Identifying the plain meaning of statutory language

involves "reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *River Road Hotel Partners*, 651 F.3d at 649. Ambiguous statutory language triggers a broader inquiry. "When the plain meaning of a statutory term is unclear, outside considerations"—for example, legislative history or reference to the same term's use in other statutes—"can be used in an attempt to glean the legislative intent." *ESBC Inc.*, 668 F.3d at 465.

Here, § 227(b)(1)(A) carves out an exception to its broad prohibition on robocalls to cellular phones for those calls made with the recipient's "prior express consent." The question requiring interpretation is: "consent *to what*?" CCS argues that the recipient need only give "general unrestricted permission and consent to be called at the subject number," which Thrasher-Lyon concedes she gave. Thrasher-Lyon, on the other hand, contends that the exception is triggered only by explicit consent to receive robocalls, which CCS agrees that she did not give. CCS argues that the weight of case law as well as binding rulings of the FCC favor its interpretation. Thrasher-Lyon relies on the language and purpose of the TCPA, and she maintains that the FCC opinions do not foreclose her interpretation because they expand the definition of consent only in the context of creditor-debtor relationships.

The Court concludes that the statutory language is not ambiguous and that Thrasher-Lyon's interpretation adheres to the plain language of the provision, consistent with its purpose and the context of the overall statute. The exception for "prior express consent" appears parenthetically within a broad prohibition on contacting cell phone subscribers using "any automatic telephone dialing system or an artificial or prerecorded voice." *See* § 227(b)(1)(A). Thus, the sentence in which the exception appears applies specifically, and *only*, to calls made with robocall technology. Because the prohibition applies only to robocalls, the exception is

similarly limited; otherwise the statute would exempt a broader class of calls than it bans in the first place. Other textual indicators confirm this reading. Notably, § 227 is titled, "Restrictions on the use of telephone equipment," and subsection (b) is called "Restrictions on use of automated telephone equipment." These descriptive headings underscore that the statute regulates only the use of robocall technology, not calls in general. An exception based upon generic consent to be contacted, rather than consent to "use of" the technology, would be anomalous in this context.

If there were any doubt on this score, interpreting "prior express consent" to require consent to robocalls, not just consent to receiving telephone calls, is also consistent with the Congressional findings accompanying enactment of the TCPA. In particular, the findings state that automated calls and prerecorded messages are a "nuisance," an "invasion of privacy," and "when an emergency or medical assistance telephone line is seized, a risk to public safety." *See* Pub. L. 102–243, § 2, ¶¶ 5-6, 9-10, 13-14, 105 Stat 2394 (1991). Moreover, "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer." *Id*. ¶ 11. At bottom, then, the TCPA bans calls using automated technology to protect consumers, placing the burden on the technology users rather than the consumers, who are ill-equipped to mitigate the nuisance. *See Lozano v. Twentieth Century Fox Film Corp*., 702 F. Supp. 2d 999, 1011 (N.D. Ill. 2010) ("[T]he TCPA serves a significant government interest of minimizing the invasion of privacy caused by unsolicited telephone communications to consumers."). This protective purpose, and its implementation by way of restricting the use of certain technology, further supports the view that the consumer must give "prior express consent" to robocalls—not to telephone calls in general—if they are to receive the automated calls that the legislature deemed invasive.

CCS's arguments to the contrary are unpersuasive. First, the Court rejects CCS's contention that this case is squarely addressed by FCC rulings that this Court cannot revisit pursuant to the Hobbs Act, which reserves to the courts of appeals the power to enjoin, set aside, suspend, or determine the validity of final FCC orders. *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010). The Court acknowledges, and does not attempt to review or alter, the FCC's ruling that "prior express consent" is provided when a debtor gives contact information to a creditor in the course of the transaction giving rise to the debt. *See In Re Rules and Regulations Implementing the TCPA of 1991*, 23 FCCR 559, 2008 WL 65485, at *3 (Jan. 4, 2008). In that context, the FCC concluded that providing "a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." This builds from the FCC's earlier determination that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *In Re Rules & Regulations Implementing the TCPA of 1991*, 7 FCCR 8752, 1992 WL 690928, at **11 (Oct. 16, 1992). The Court does not quibble with the FCC's carve-out for the creditor-debtor relationship; Congress specifically anticipated that the FCC would "design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy." *See* Pub. L. 102–243, § 2, ¶13,105 Stat 2394 (1991).

What we have here is different. Plaintiff's claim does not involve a debtor-creditor or other relationship where providing a phone number "reasonably evidences" express consent to be called, even with automated equipment, *about a debt*. This is obvious with respect to Thrasher-Lyon's provision of the number to Ferguson and the police at the scene of the accident; she

would have had no reason to believe that debt collection would be an outgrowth of those interactions. Nor was her interaction with Farmers (in whose shoes CCS now stands) sufficient to reasonably evidence express consent to be robo-called about a subrogation claim. Thrasher-Lyon did not voluntarily provide her number to Farmers in the first instance, let alone for the purposes of receiving a loan or other service. She simply verified that the number Farmers already had obtained from the police report (and already used) was the "best" ,and only, number at which to reach her. Missing from this case are any facts from which it could be inferred that Thrasher-Lyon's verification of her phone number was tantamount to giving permission to being robocalled about a purported debt—one she didn't even know about at the time she disseminated or confirmed her number. This is in marked contrast to the 2008 FCC ruling and the creditor-debtor cases on which CCS relies.

A common theme of those cases is the plaintiff's provision of contact information in connection with the knowing creation of a debt by voluntarily opening an account or otherwise contracting to pay for some service. *See Osorio v. State Farm Bank, F.S.B.*, --- F. Supp. 2d ---, 2012 WL 1671780 (S.D. Fla. May 10, 2012) (number provided on credit card application); *Cavero v. Franklin Collection Serv., Inc.*, No. 11–22630–CIV, 2012 WL 279448 (S.D. Fla. Jan. 31, 2012) (number listed on an account for telephone and internet service); *Mitchem v. Ill. Collection Serv., Inc.*, No. 09 C 7274, 2012 WL 170968 (N.D. Ill. Jan. 20, 2012) (billing number provided to doctor when receiving treatment); *Adamcik v. Credit Control Servs., Inc.*, 832 F. Supp. 2d 744, 748 (W.D. Tex. 2011) (number provided with student loan application); *Greene v. DirecTV, Inc.*, No. 10 C 00117, 2010 WL 4628734 (N.D. Ill. Nov. 8, 2010) (number provided to fraud alert service); *Cunningham v. Credit Mgmt., L.P.*, No. 09-CV-1497, 2010 WL 3791104, at *5 (N.D. Tex. Aug. 30, 2010) (number provided in connection with internet services account).

Under the FCC's reasoning, consent to be contacted about a debt or bill can be reasonably inferred from the provision of contact information in connection with the voluntary establishment of a commercial relationship by means of a transaction creating a debt..

Here, however, it would be a stretch to call Farmers a "creditor" of Thrasher-Lyon, and stranger still to view getting into a car crash as the equivalent of applying for a loan or contracting for services. Thrasher-Lyon did not affirmatively make contact with Farmers or CCS in order to obtain a service and provide her number as part of the process and sought no relationship with either company. She did not give up her phone privacy in exchange for a benefit such as a loan or cable television. Moreover, there is no evidence in the record that Thrasher-Lyon had incurred a debt to Farmers at the time she gave out her number or when the robocalls were placed. Evidence that Farmers paid Ferguson's claim does not suffice. Farmers did not reduce its subrogation claim to judgment, so when CCS began dunning her with robo-calls, it was on the basis of nothing more than Farmers' opinion that Thrasher-Lyon was responsible for the accident and Ferguson's expenses. Farmers might be correct, but that remained to be determined at the time the robocalls began and provides no basis from which consent to be robo-called can be inferred.

The FCC's creditor rule, which goes beyond the plain language of the TCPA to mitigate a burden on creditors that was likely not intended by the statute, is binding on this Court, but CCS seeks to expand the FCC's ruling well beyond its moorings in a voluntary transaction giving rise to a debtor-creditor relationship. The Court rejects CCS's argument that it can avail itself of the FCC's creditor rule before a debt even exists. CCS's argument is inconsistent with the rationale behind the 2008 FCC order that envisions an individual who voluntarily makes contact with a provider of services, whether medical, financial, or otherwise, and takes on debt as a result.

Nothing in the FCC's rulings suggests that it was intended to apply outside the context of a debtor-creditor relationship. Accordingly, the Court does not find the FCC's creditor rule, or the cases applying it, applicable or instructive in the very different factual context of this case.

CCS insists that it would be "bizarre" to interpret the statute to require "elaborate" consent using "magic words," but there is nothing bizarre about giving effect to all of the words in the statutory language. It is what courts are required to do. Bizarre would be to read "express consent" as "implied consent." In ordinary parlance, there is no such thing as "implied express consent"—that is an oxymoron. Giving out one's phone number, at least outside of the special relationship sanctioned by the FCC, is not "express" consent to besiegement by automated dialing machines. One "expresses" consent by, well, expressing it: stating that the other party can call, or checking a box on form or agreeing to terms of service that explicitly permit automated telephone contact. *See Satterfield v. Simon & Schuster*, 569 F.3d 946, 955 (9th Cir. 2009) ("Express consent is consent that is clearly and unmistakably stated.") (citation omitted). "Express" connotes a requirement of specificity, not "general unrestricted permission" inferred from the act of giving out a number, as CCS urges. Agreeing to be contacted by telephone, which Thrasher-Lyon effectively did when she gave out her number, is much different than expressly consenting to be robo-called about a debt she did yet know Farmers believed she owed.

"When a text can be applied as written, a court ought not revise it by declaring the legislative decision 'absurd.'" *Soppet v. Enhanced Recovery Co*., 679 F.3d 637, 642 (7th Cir. 2012). No doubt CCS and other robo-callers think it unduly burdensome to obtain advance express consent to receive robocalls, given the modern proliferation of cellular phones and the decreasing incidence of grounded residential telephone lines. But it is not this Court's prerogative to amend the statute to conform to changing times or to attempt to improve it. *See id*.

9

In any event, and as explained above, there is nothing absurd about Congress's determination to require express consent before subjecting telephone consumers to a barrage of automated phone calls or prerecorded messages. As the statute's title advertises, it was enacted for the benefit of telephone consumers and, accordingly, Congress required consumers to opt *in*—expressly—to robocalls than to take steps to opt out or to expressly limit the scope of their consent any time they disseminate their phone numbers, as CCS would have it. The language of the statute makes consent the exception, not the default.

## CONCLUSION

For all these reasons, the Court concludes that, as to Thrasher-Lyon, CCS cannot avail itself of the statutory exception for robocalls placed with prior express consent. As a matter of law, Thrasher-Lyon's provision of her telephone number to the Ferguson, the police, and Farmers was not prior express consent to receive CCS's robocalls on her cellular phone. Moreover, CCS has failed to establish with admissible evidence that at the time of the robocalls, Farmers was Ms. Thrasher's creditor for purposes of the FCC's creditor-debtor rule, which therefore does not apply here. Accordingly, the Court GRANTS the plaintiff's motion for partial summary judgment and DENIES the defendant's motion for partial summary judgment.

Date: September 4, 2012

Honorable John J. Tharp, Jr.
U.S. District Judge