IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELISSA THRASHER-LYON, on behalf of herself and a class similarly situated, | ) ) ) |
| Plaintiff, | ) Case No.: 11-C-4473 ) |
| vs. | ) Judge Ruben Castillo ) Magistrate Judge Michael T. Mason |
| CCS COMMERCIAL LLC d/b/a CREDIT COLLECTION SERVICES COMMERCIAL, | ) ) ) |
| Defendants. | ) ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTIONS TO RECONSIDER AND TO CERTIFY APPEAL**

Plaintiff Melissa Thrasher-Lyon ("Plaintiff" or "Thrasher") respectfully submits this consolidated response to the motion to reconsider and the motion to certify an interlocutory appeal filed by Defendant CCS Commercial LLC d/b/a Credit Collection Services Commercial's ("Defendant" or "CCS"). Both motions should be denied for the reasons that follow:

**Overview**

While motions to reconsider can serve an important function in certain limited circumstances, no such circumstances are present here. CCS simply aspires to try again with a new argument, namely, that the Court was required to imply consent to debt collector robocalls under the FCC's 1992 TCPA Order ("1992 Order") even if this case falls outside of the FCC's requirements in its 2008 Ruling. This new argument, even were it timely presented, has no more merit than CCS' previously-unsuccessful position, and should be rejected.

As discussed more fully below, the 2008 Ruling considered the 1992 Order's effect on debt collectors and concluded that debt collectors may robocall in the absence of actual express "only if" the debtor gave the number to the creditor as part of a credit transaction. Given the "only if" language, CCS's new argument that the 1992 Order provides an alternative basis for debt collectors

to deem consent even if the facts fall *outside* of the 2008 Ruling is highly suspect. The FCC indicated the limits of implied consent with the "only if" limitation while construing the 1992 Order. Courts traditionally defer to an agency's construction of its own rules, and the 2008 construction of the 1992 Order should be no exception.

Deference aside, there is not even an arguable reading of the 1992 Order that deems consent to robocalls if motorists exchange numbers at an accident scene. The 1992 Order was addressed to the question of implied consent for customer inquiries, circumstances where the called party has contacted a business and provided it with a number to return the call. The TCPA presented a problem for such inquiries because businesses could not determine if the number was a cell phone using the technology available at the time. Thus, businesses were effectively foreclosed from using automatic dialing technology to respond to any inquiries.

For that scenario, the FCC accepted the commenters' position that a customer invites autodialing by supplying his number to a business, stating that: "any telephone subscriber that provides his or her telephone number *to a business* does so with the expectation that *the party to whom the number was given* will return the call. Hence, any telephone subscriber who releases his or her telephone number has, in effect, given prior express consent to be called *by the entity to which the number was released*." Id. ¶ 30 (emphasis added). By contrast, the FCC refused to imply consent where a business captures the phone number from caller ID during a customer inquiry. Id. ¶ 31 ("However, if a caller's number is 'captured' by a caller ID or an ANI device without notice to the [cellular] telephone subscriber, the caller cannot be considered to have given an invitation or permission to receive autodialer or prerecorded voice message calls").

Nowhere in the 1992 Order does the FCC even mention a situation where one private individual gives a number to another. That is because businesses use robocalling; individuals do not. The whole basis for inferring consent is therefore lacking when an individual gives his/her number

to another individual as opposed to a business. So CCS has no basis to claim that the 1992 Order deems consent when Thrasher exchanged phone numbers at the scene of an accident.

Neither is there any support for CCS's argument about Farmers confirming Thrasher's number because Thrasher did not give her number to Farmers. In fact, if Farmers tried to claim consent from that call, it would be on even weaker ground than businesses that capture numbers on caller ID (whom the FCC excluded from the 1992 Order) as Thrasher did not even call it.

In short, CCS has no leg to stand on. Its interpretation not only violates the FCC's treatment of the 1992 Order in the 2008 Ruling, it also ignores the entire context for and express language of the 1992 Order itself. Taking snippets of language out of the context is never a legitimate way of deriving meaning, whether from an agency order or a statute. Because no FCC order deems consent in this scenario, the TCPA applies as written. Actual express consent is required and CCS admits that it does not have such consent. Summary judgment was proper.

It follows also that the Court should deny CCS's *pro forma* Section 1292(b) motion. Litigants are not entitled to run straight to the appellate court over every adverse ruling and, here, CCS has failed to come anywhere close to justifying the extraordinary step of an interlocutory appeal. CCS did not even present its main arguments in the initial round of briefing, and it is now plain that CCS's proffered interpretation conflicts with the language that the FCC used in two separate orders. CCS thus cannot meet its burden of showing the issue is "contestable," which means a "substantial likelihood" that this Court would be reversed.

Accordingly, and for the reasons explained further below, the Court should reject both the motion to reconsider and the *pro forma* motion to certify an appeal. Rather, CCS should respond to the class certification brief and the case should move into its final (and straightforward) phase of calculating statutory damages based on CCS database of calls.

3

**Applicable Standard**

"'Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence.' With regard to 'manifest error,' the Seventh Circuit has explained that a motion to reconsider is proper only when 'the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.'" Brown v. Navarro, 09 C 3814, 2012 WL 3987427, *2 (Sept. 11, 2012) (Tharp, J.) (citations omitted). "A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" Oto v. Metropolitan Life Ins. Co., 224 F.3d 601, 606 (7th Cir. 2000).

**Argument**

**A.     CCS chose to disregard Congress's restrictions on its business model**

It is important to start with what is not in contention. CCS does not challenge the Court's correct ruling that Congress used the term "prior express consent" to mean specific authorization to be robocalled. Def's Mem. at 4; Thrasher-Lyon v. Illinois Farmers Ins. Co., No. 11 C 04473, 2012 WL 3835089, at *2 (Sep. 4, 2012). Accord 137 Cong. Rec. S16204, S16206 (1991) (The bill "allows consent to be given orally, in writing, electronically, or by any other means, as long as the consent is expressly given to the particular entity making the call. Such consent could be obtained, for instance, by a live person who simply asks the called party whether he or she agrees to listen to a recorded message.") (remarks of TCPA sponsor Senator Hollingsworth). Rather, CCS's argument is that Congress's intent is trumped by virtue of the Hobbs Act because this Court lacks jurisdiction to review two FCC orders that, according to CCS claims, allow it to infer consent to be robocalled on the facts of this case. Def's Mem. at 4.

Plaintiff agrees that the Court is required to apply the FCC's orders *according to their terms* even if they conflict with the TCPA itself because the Hobbs Act prevents this Court from invalidating

those orders. But the fact that a court must enforce an agency's orders under the Hobbs Act does not require it to accept one side's tortured reading of the order's effect. E.g. CE Design, Ltd. v. Prism Business Media, Inc., 606 F.3d 443, 450 (7th Cir. 2010) ("Having concluded that the district court correctly determined that it lacked jurisdiction to consider whether to enforce the EBR defense in the present case, we turn to CE Design's argument that its subscriber relationship with Prism does not fall within the FCC's definition of an EBR.").

Here, the FCC has never said that it would imply consent to robocalling when one individual gives her number to another individual (as opposed to a robocalling business). What it did say is that consent would be implied when a person gives his phone number to a business and requests a call at that number, which is the 1992 Order. It also recognized a special form of consent for consumer debts, when a consumer gives a number to a creditor to obtain a loan, even if there was no affirmative indication that the debtor wanted to be called there, which is the 2008 Ruling. The Court cannot expand those orders in this proceeding, and CCS cannot save its illegal robocalling campaign by stretching the orders beyond their express terms.

1. <u>The 2008 Ruling is specific to consumer loans and cannot be judicially expanded</u>

In its summary judgment decision, this Court correctly held that the 2008 Ruling is an FCC-made "carve-out" to the statutory requirement for prior express consent "that envisions an individual who voluntarily makes contact with a provider of services, whether medical, financial, or otherwise, and takes on debt as a result." Thrasher-Lyon, 2012 WL 3835089, at *5. The Court therefore refused CCS's request to extend this carve-out to circumstances outside that context.

CCS's retort relies on two untenable arguments. First, CCS makes a *sub rosa* argument that the Court should essentially ignore the context of the carve-out and the FCC's express limitation of it. See 2008 Order ¶ 10 ("We emphasize that prior express consent is deemed to be granted *only if* the wireless number was provided by the *consumer* to the *creditor*, and that such number was provided *during the transaction that resulted in the debt owed*.") (emphasis added). Obviously, the Court cannot read

5

that language out of the ruling without doing violence to the FCC's intent. Nor would it be proper to expand the ruling beyond its express terms.

Second, CCS tries distort the meaning of the words "debt" and "transaction" in the sentence: "We emphasize that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed.") The FCC's meaning for those words is clear from the face of the 2008 Order -- it was talking about collections on consumer accounts. Id. ¶ 8 ("[We are addressing a petition] that the prohibition against autodialed or prerecorded calls to wireless telephone numbers 47 C.F.R. § 64.1200(a)(1)(iii) does not apply to creditors and collectors when calling wireless telephone numbers to recover payments *for goods and services received by consumers*.") (emphasis added). See also id. ¶ 10 n. 36 (quoting petition that the calls "are limited to customers of creditors who have received a product without payment.").

Nevertheless, CCS tries to expand these terms far beyond what the FCC intended. It argues that an unliquidated tort claim is a "debt" and that a "transaction" is anything "performed or carried out" such that Thrasher becomes a debtor and the car accident becomes a "transaction that resulted in the debt owed" (although CCS never explains how Thrasher might be considered a "consumer"). Def's Mem at 12. But CCS is merely parsing words. If CCS were right that a subrogation claim is a "debt" then so too is a TCPA claim. And if a car accident is a "transaction" then so too is a robocalling campaign. So can class members now robocall CCS's 800 number willy nilly under the 2008 Ruling? Of course not, because that is not what the FCC was talking about when it used the terms "consumer," "debt" and "transaction."

While the FCC's wording is conclusive, it is also true that CCS did not misunderstand the Ruling. Rather, it is contradicting itself in different fora. CCS submitted comments as part of the proceedings on the 2008 Ruling, arguing for a consumer debt exception. See Ex. 1, Comment of

6

Steven Sands President of Credit Collection Services. For example, Mr. Sands had the following to say when urging the FCC to grant the ACA's petition:

- "I urge you as the chair of the FCC to ask the commission to grant ACA International's (ACA) request for regulatory clarification in favor of the industry as well as all consumers who lawfully pay for goods and services they have purchased. . . . Between 1991 and 2003, the FCC consistently ruled that this autodialer prohibition did not apply to calls made using an autodialer *if the sole purpose of the calls was to recover payments for goods and services purchased.*" Id. at 1 (emphasis in original).

- "I use predictive dialers to complete transactions for which consumers have obtained a benefit, without payment." Id. at 2.

- "Banning [robocalls] in this *limited context* would not only be inconsistent with Congress's intent, but it would be an unconscionable interference with creditors' ability to request payment from its own *customers*." Id. (emphasis added)

- "There was never any intention on the part of Congress to prohibit creditors and their retained collection agencies from being able to contact consumers on their wireless phones about a past due *payment obligation for goods and services already purchased and received.*" Id. (emphasis in original).

- "For these reasons, the FCC should promptly clarify that autodialer calls to wireless numbers *solely to recover payment obligations* are not covered by the TCPA regulations for the reasons expressed by ACA." Id. at 3.

Put simply, CCS knows that the FCC was addressing a limited context, one which covered CCS's core business of collecting from debtors on "payment obligations for goods and services already purchased and received" but not its side business of enforcing unadjudicated tort claims. CCS got the exact ruling it sought from the FCC on this point: no more and no less. It is disingenuous and unfair to try to get more and to expand the ruling to others who were not expressly covered by it, simply because the venue has now changed. In fact, the Hobbs Act forbids CCS's attempts. Persons affected by an FCC order have only 60 days to appeal it, 28 U.S.C. § 2344, after which it becomes binding even if it contradicts the Constitution or the statute that empowers the agency in the first place. CE Design, Ltd., 606 F.3d at 450. If courts could broaden FCC rulings beyond their express terms, based on a party's policy arguments, then every rulemaking must be appealed on every conceivable issue to establish the boundaries of judicial expansion. Further, the

7

validity of the agency's actions would have to be determined based not on what the agency actually said, but on how its orders might later be extended. Cf. Soppet v. Enhanced Recovery Co., LLC, 679 F.3d 637, 642 (7th Cir. 2012) (Courts cannot use the guise of interpretation to make substantive changes to the FCC's rules "designed to make the law 'better.' That would give the judiciary entirely too much law-making power.").

    2.    The 1992 Order is not a catchall

CCS has manufactured a reading of the 1992 Order that the FCC never intended. The FCC explained itself in a three paragraph discussion but CCS excerpts only a small part, where the FCC said that ". . . persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at that number which they have given, absent instructions to the contrary." Def's Mem. at 9 (quoting 1992 Order ¶ 31). CCS strips this excerpt of its antecedents -- that reflect the circumstances of "releasing" the phone number -- and of its object, indicating to whom the phone number must be released. Having jettisoned all context, CCS concludes that Thrasher consented to robocalls by exchanging phone numbers at the accident scene supposedly because *anyone* who gives his/her phone number to *anyone else* impliedly consents to robocalls: "the 1992 Order provides that consent exists when *any person* provides their number to another." Def's Mem. at 9 (emphasis in original).

CCS's reading is breathtaking in scope. As CCS would have it, the 1992 Order allows plaintiff's counsel to robocall the driver to see if he will disavow the claim CCS is enforcing against Thrasher. Any bystander who gives his number to the motorists could also be robocalled; and the list of implied consenters goes on and on: young people arranging a date, an attorney handing out his card, parents who leave contact information when a child spends the night at a friend's house. They are all an "*any person*" who "provides his phone number to another."

If this is how the FCC reads the 1992 Order, it is impossible to understand why it would have put the "only if" limiting language in the 2008 Ruling. The answer of course is that the

8

1992 Order was never intended to cover the vast landscape of interactions between individuals (as opposed to with a business. Exelon Generation Co., LLC v. Local 15, Intern. Broth. of Elec. Workers, AFL-CIO, 676 F.3d 566, 575 (7th Cir. 2012) (When construing regulations, courts may not assume that agencies "hide elephants in mouseholes.").

As in statutory construction, a court should look at the entire agency rule. Id. at 572 ("In regulatory and statutory construction, however, context is critical."); Soppet, 679 F. 3d at 642 (in determining a regulation's meaning, courts "do not parse."). Here, the three-paragraph discussion, paragraphs 29-31, addressed a particular problem raised by several commenters about responding to customer inquiries when the customer leaves a cell phone number for the return call (*i.e.*, situations where the called party reached out to the business). Id. ¶ 29 ("Several commenters express concern that they would unintentionally incur liability by placing calls to individuals who provided a number at one of the "prohibited destinations" (for example a hospital or emergency line) as the number at which that individual could be reached.").[1]

As an example of the "several comment[s]" it was talking about, the FCC cited the American Banker's Association (ABA) Comments, id. ¶ 29 n. 54, in which the ABA stated that banks need to be able to use robodialing to respond to those "who have given their phone number to the business when making inquiries about or applications for its products or services." Ex. 2, ABA Comments at 2. The ABA sought protection because businesses could not know whether the callback number was a cell phone: "the ABA believes the regulations should also protect businesses which inadvertently dial a number in a protected class under the Act (*e.g.* emergency numbers, cellular lines, etc.) when the called party has provided the business with the telephone number." Id. at 3. Several other commenters raised the same issue. See Ex. 3, J.C. Penney Comments at 6 ("If a customer volunteers

---

[1] Technology at the time did not allow businesses to discovery if the number provided to them was a cell phone number. Id. ¶ 29. That is no longer the case.

9

to a merchant the number of his car phone, the guest room of a health care facility, or a particular residential number, the merchant should not be penalized for taking the consumer at his word."); Ex. 4, National Retail Federation Comments at 3 ("Certainly if the customer volunteers a number at which he or she may be called, merchants should not be penalized for placing the call to that number.").

The FCC's solution was to imply consent from the customer's choice to provide the business with a number at which to call him. See 1992 Order ¶ 31 ("Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached."). By contrast, the FCC ruled that businesses could not imply consent if they take the number off of caller ID when a customer contacts them. Id. ("However, if a caller's number is 'captured' by a Caller ID or an ANI device without notice to the residential telephone subscriber, the caller cannot be considered to have given an invitation or permission to receive autodialer or prerecorded voice message calls."). The caller had to provide the number to the business.

CCS cannot expand the order by parsing the FCC's discussion. For a business to deem consent under the 1992 Order, the called party must have reached out to *that business* and given *that business* her number for *that business* to call her back. See 1992 Order at ¶ 30 (Giving the commentary context that "any telephone subscriber that provides his or her telephone number *to a business* does so with the expectation that the *party to whom the number was given* will return the call. Hence, any telephone subscriber who releases his or her telephone number has, in effect, given prior express consent *to be called by the entity to which the number was released*.").[2]

---

[2] Compare Thrasher-Lyon, 2012 WL 3835089, at *5 ("Under the FCC's reasoning, consent to be contacted about a debt or bill can be reasonably inferred from the provision of contact information in connection with the voluntary establishment of a commercial relationship by means of a transaction creating a debt.").

Thrasher's act of exchanging phone numbers with a person after an accident lacks the qualities that would allow CCS to deem consent under the 1992 Order. She did not give her number to a business, she gave it to an individual; and individual do not use robocallers. So there is no action basis to infer consent under the Order. Also, because CCS is not the "entity to which the number was released," the 1992 Order does not deem consent for CCS by its terms.

Likewise, nothing in the 1992 Order transforms Thrasher's conversation with Farmers into an invitation to robocall. Though Farmers is at least a business rather than an individual, Thrasher neither initiated contact with Farmers nor gave Farmers her number. In fact, CCS is on even weaker ground than the businesses that were capturing numbers from caller ID (for whom the FCC refused to deem consent) because she did not even call Farmers. Direct provision of the phone number by the called party to a business is the crux of the 1992 Order. During that call, Farmers was free to ask Thrasher for actual consent to robocall her, but it did not; and it cannot manufacture "prior *express* consent" by ambiguously confirming phone numbers.[3]

**B.     There is no issue here worthy of the Seventh Circuit's time**

Any consideration of CCS's perfunctory motion to certify an appeal here should start with the fact that interlocutory appeals are disfavored by the Seventh Circuit and are supposed to be granted only in "exceptional" cases. Blair v. quifax Check Servs., Inc., 181 F.3d 832, 835 (7th Cir. 1999) ("[The Section 1292(b)] procedure interrupts the progress of a case and prolongs its

---

[3] CCS appends a one-sentence new argument that the Court should have referred the case to the FCC rather than interpret the orders itself. Def's Mem. at 14. A motion to reconsider is not a proper vehicle for raising new argument, Ahmed v. Ashcroft, 388 F.3d 247, 294 (7th Cir. 2004), and regardless, the request is nonsense. CCS identifies no practical reason to lob this case to the FCC, much less a procedural basis for it to be adjudicated there, and, tellingly, CCS has not cited a single TCPA case (out of hundreds or more on the books) where a court tried to do that. The only cases it cites is C.E. Design, which stated that a challenge seeking to *invalidate* an FCC order must be brought before the FCC by virtue of the Hobbs Act. But the validity of these orders is conceded here, and there is no impediment to the Court interpreting the order. In fact that is exactly what the C.E. Design court went on to do. Id. at 450 (interpreting the TCPA regulations after finding that it lacked jurisdiction to invalidate them).

11

disposition. That bogey is a principal reason why interlocutory appeals are so disfavored in the federal system."); Hardware v. Landen Hardware,, No. 10-c-2284, 2012 WL 2553532, *2 (N.D. Ill. June 28, 2012) ("Quite simply, this is not an exceptional case warranting deviation from the normal rule that a dissatisfied party must appeal from a final order."). Most cases should await final judgment because interlocutory appeals interject inefficiencies and burden the Seventh Circuit with questions that may be mooted by further refinement of the dispute or by settlement. Conticommodity Servs., Inc. v. Ragan, 826 F.2d 600, 601 (7th Cir. 1987) ("Interlocutory appeals are disfavored because generally they interrupt litigation and burden appellate courts unduly."). It follows that the Court should seriously scrutinize CCS's certification request to ensure that it is not a waste of the Seventh Circuit's time.

CCS's starkly underdeveloped motion fails to demonstrate an exceptional case. The pure question of law CCS has defined is no different than with any summary judgment ruling: assuming the facts as the district court found them, did the court get the law right?

And, even though that may be a pure question of law, the Court's resolution of the summary judgment motion is not "contestable." To meet that requirement, CCS must demonstrate either that "there are substantial conflicting decisions regarding the claimed controlling issue of law, or the question is not settled by controlling authority and there is a substantial likelihood that the district court ruling will be reversed on appeal." Calvin v. Sheriff of Will County, No. 03 C 3086, 2006 WL 1005141, 3-4 (N.D. Ill. April 14, 2006). See also In re Brand Name Prescription Drugs, 878 F. Supp. at 1081 ("Where a controlling court of appeals has not decided an issue, it must still be demonstrated that a 'substantial likelihood' exists that the district court ruling will be reversed on appeal.").

CCS's sole offering on contestability is a two sentence argument without any explanation as to why there is either a *substantial* likelihood that the district court will be reversed, or a *substantial* conflict in the case law. Presumably CCS means to rely on the later ground when it says that its

counsel could only find two cases in this area, district court decisions from Minnesota and California, respectively. Putting aside the question of whether two district court cases ever make for "substantial conflicting decisions," the fact of the matter is that the cases are not in conflict. Both construed the 2008 Ruling the same way, and exactly as this Court did.

First, Leckler v. Cashcall, Inc., 2008 WL 5000528 (N.D. Cal. Nov. 21, 2008) ("Leckler II"), involved a claim by the exact type of person addressed in the 2008 Ruling: a consumer who provided her cell phone number to a creditor as part of a credit application. See Leckler v. CashCall, Inc., 554 F.Supp.2d 1025 (N.D. Cal. 2008) ("Leckler I") ("Plaintiff Tricia Leckler applied for a personal loan from defendant CashCall, Inc. . . On her loan application, she was asked to provide her home, cell, and work phone numbers, as well as her email address, home address, and other contact information, all of which she provided."). Leckler I had held that the 2008 Ruling conflicted with the TCPA's "prior express consent" requirement by allowing implied consent, id. at 1029, and so refused to enforce the 2008 Order. Leckler II, however, vacated that decision based on the Hobbs Act. Id. at *2. Thus Leckler II simply applies the 2008 Ruling in accordance with the "only if" limitation for numbers provided in credit applications. This Court construed the 2008 Ruling the same as Leckler II, but unlike Leckler II, this Court was not confronted with a Plaintiff who fit the 2008 Ruling's "only if" limitation.

As to Edeh v. Midland Credit Mgmt, Inc., 748 F. Supp. 2d 1030 (D. Minn. 2010), there is no indication that the Defendant, a purchaser of delinquent debt, ever raised the 2008 Ruling as a basis to imply consent. Midland's only argument was that it had relied on the seller to have obtained actual consent form the borrower. Because the Edeh opinion did not treat the 2008 Ruling at all, it can hardly be said to conflict with Leckler II or this Court's opinion, much less "substantially" so. Even more, the Edeh court construed the TCPA's "prior express consent" language exactly as this Court did, finding that express consent to robocalling cannot mean implied consent. That Court was free to require adherence to the statute because the Defendant did not rely upon the FCC's

13

2008 Ruling (as a purchaser of delinquent debt, id. at 1038, it may not have possessed the requisite paperwork) just as this Court was free to do so because the facts at bar are outside the scope of the Ruling.

Because there is no "substantially likelihood" of the Seventh Circuit finding error in this Court's ruling, certification would be improper.

The *pro forma* motion also fails to demonstrate an exceptional case on the "controlling question" and "material advancement" prongs. CCS calls the question controlling but it never takes a position as to what it controls. If CCS means only that the question is controlling on Plaintiff's individual claims, then interlocutory review will hardly speed the case. For her claim, all that is left it to determine her statutory damages from CCS's call database. An interlocutory appeal would vastly prolong that process. If CCS concedes that the question is controlling as to the entire class claim then it might have an intuitively stronger argument, but, even then, its concession as to class certification would moot the only estimable judicial burden that remains. Besides deciding to certify and giving an opt out period, the only remaining step to final judgment is to award the class pre-determined statutory damages, which can be calculated automatically with CCS's own database. In short, there is not enough left to do here to turn the natural inefficiencies from an interlocutory into a net saver of judicial resources. Defendant's motion only makes sense if it is trying to interject needless delay or trying to get an adjudication that will allow it to determine whether to bankrupt the claim before it has to bond a final judgment. In either case, certification of an interlocutory appeal will not "secure the just, speedy, and inexpensive determination of [this] action". FRCP 1.

## Conclusion

Because there is no FCC order that covers the facts in this case, there is also no Hobbs Act impediment to enforcing the TCPA as written. CCS admits that there was no actual express authorization to make robocalls, and so summary judgment for Plaintiff was proper. Likewise, there

14

is no good reason to burden the Seventh Circuit by certifying an interlocutory appeal for such a one-sided question. Accordingly, both motions should be denied

**Dated: September 21, 2012**        **Respectfully Submitted,**

   /s/ Michael Kanovitz

Arthur Loevy
Michael Kanovitz
Jon Loevy
Anand Swaminathan
Scott Rauscher
LOEVY & LOEVY
312 May Street, Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Scott R. Rauscher, certify that on September 21, 2012, I caused the foregoing Memorandum to be served on all counsel of record by ECF.

   /s/ Scott R. Rauscher

15